UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

17-CV-531 (JLS) (HKS)

MARIKA MARAGHKIS KATHOLOS,

Defendant.

### DECISION AND ORDER

The United States commenced this action pursuant to 31 U.S.C.

§ 3711(g)(4)(C), seeking judgment against Defendant Marika Maraghkis Katholos

for an outstanding penalty of $4,474,320.29 assessed against her, pursuant to 31

U.S.C. § 5321(a)(5), for failure to report timely her financial interest in, or signature

or other authority over, a foreign financial account during the 2007 calendar year,

as required under 31 U.S.C. § 5314 and implementing regulations. *See* Dkt. 1; Dkt.

6 (redacted Complaint).

There are three motions before the Court: (1) Katholos's motion to strike

allegations in the Complaint or, alternatively, to designate a tax law expert, Dkt.

81; (2) the Government's motion for summary judgment, Dkt. 83; and (3) Katholos's

motion to amend her amended answer, Dkt. 96.

For the following reasons, Katholos's motion to strike and to designate a tax

law expert is denied, the Government's motion for summary judgment is granted in

part and denied in part, and Katholos's motion to amend is denied as moot.

## PROCEDURAL HISTORY

Katholos filed an answer to the Complaint on August 11, 2017, Dkt. 7, which was amended with consent of the Government and the Court on December 11, 2018, Dkt. 31, 32. After numerous extensions of time, *see* Dkt. 14, 28, 35, 43, 48, 50, 53, 56, 63, all discovery was completed by February 28, 2021. Dkt. 63.

Katholos filed the pending motion to strike on June 9, 2021, Dkt. 81, and the Government filed its response on June 23, 2021. Dkt. 82.

On July 16, 2021, the Government filed a motion for summary judgment. Dkt. 83. On September 20, 2021, Katholos responded, Dkt. 98, and moved to amend her answer, Dkt. 96. On October 28, 2021, the Government filed a reply in support of summary judgment, Dkt. 111,[1] and a response to Katholos's motion to amend, Dkt. 112. Katholos filed a response in further support of her motion to amend on November 18, 2021. Dkt. 116.

After the parties briefed the pending motions, the Court referred the case to mediation. Dkt. 120. The parties engaged in mediation on March 22, 2022, but were unable to settle the case. *See* Dkt. 125.

---

[1] On April 27, 2022, Katholos also filed a notice of supplemental authority regarding proper calculation of the assessed penalty, Dkt. 127, and the Government responded. Dkt. 130.

## BACKGROUND[2]

Katholos was born and grew up in Buffalo, New York.  Dkt. 83-2, ¶¶ 1, 3;
Dkt. 98-1, ¶¶ 1, 3.  Her father, Theodore Katholos, was a Greek immigrant and
successful businessman.  Dkt. 83-2, ¶¶ 1, 2; Dkt. 98-1, ¶¶ 1, 2.  After completing
college, Katholos moved to Greece in 1994 and has lived there since.  Dkt. 83-2, ¶ 4;
Dkt. 98-1, ¶ 4.

Katholos and her father, who did not speak or read English well, Dkt. 83-2,
¶ 2; Dkt. 98-1, ¶ 2, went to Zurich, Switzerland, and opened two accounts ending in
83394 and 71711 with UBS.  Dkt. 83-2, ¶¶ 10, 15; Dkt. 98-1, ¶¶ 10, 15 (stating that,
although Katholos accompanied her father, it was Mr. Katholos who opened the
accounts).  Katholos's name is on both accounts as an accountholder of record.  Dkt.
90-5 at 1, 8; Dkt. 90-6 at 1, 8.  Both were "numbered" accounts.  Dkt. 83-2, ¶¶ 11,
16; Dkt. 98-1, ¶¶ 11, 16.  As to the first UBS account, any correspondence was sent

---

2 The following is a summary of the facts found in the statements of undisputed
facts and exhibits filed by both sides in connection with the motion for summary
judgment.

On summary judgment, "[a] party may object that the material cited to support or
dispute a fact *cannot be presented in a form* that would be admissible in evidence,"
but Federal Rule of Civil Procedure 56(c)(2) "simply provides that the evidence must
be capable of presentation in admissible form at the time of trial; it does not require
that the materials be presented in an admissible form on summary judgment."
*Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22, 38 (W.D.N.Y. 2014) (internal
quotation marks and citation omitted).  To the extent the Court includes facts based
on evidence that was objected to, the Court has concluded that such evidence is
capable of presentation in admissible form at the time of trial.  Both parties are
entitled to continue to raise their objections at or before trial.

to a P.O. Box in Athens, Greece, and as to the second UBS account, correspondence was directed to be held at UBS. Dkt. 83-2, ¶¶ 11, 16; Dkt. 98-1, ¶¶ 11, 16.

The Government states that, when opening these accounts, Katholos signed a document indicating that she was not a U.S. citizen and did not have dual citizenship. Dkt. 83-2, ¶¶ 12, 17. Katholos states that she presented her United States and Greek passports to UBS bankers, and that her Greek passport indicates that her place of birth is the United States. Dkt. 98-1, ¶¶ 12, 17. Katholos states that she would "just sign[]" forms because she and her father trusted UBS. Dkt. 98-1, ¶ 13.

In February 2005, Katholos met with a UBS representative, Carmen Kaufmann, in Zurich to discuss the accounts. Dkt. 83-2, ¶ 19; Dkt. 98-1, ¶ 19. During the meeting, UBS recommended the formation of a Liechtenstein entity called the Storchen Family Foundation (the "Foundation"), which was ultimately formed on February 28, 2005. Dkt. 83-2, ¶¶ 19, 20, 21; Dkt. 98-1, ¶¶ 19, 20, 21. Katholos also asked Kaufmann about obtaining "good tax advice" in Greece, but did not ask about obtaining tax advice in the United States. Dkt. 83-2, ¶ 19; Dkt. 98-1, ¶ 19.

On March 3, 2005, another UBS account ending in 36795 was opened (the "Foundation Account") under the name Storchen Family Foundation c/o Consilia Anstalt, signed by members of the Foundation's board. Dkt. 83-2, ¶ 22; Dkt. 98-1, ¶ 22. The funds from the prior UBS accounts as well as funds from an account of Katholos's husband "pooled together and funded the foundation." Dkt. 83-2, ¶ 24;

4

Dkt. 98-1, ¶ 24.  In the account opening documents, Katholos is identified as one of the beneficial owners of the assets in the Foundation Account.  Dkt. 83-2, ¶ 25; Dkt. 98-1, ¶ 25.  Copies of Katholos's family members' United States passports were included in those documents.  Dkt. 83-2, ¶ 25; Dkt. 98-1, ¶ 25.  A copy of Katholos's Greek passport is included in the account opening documents, but her United States passport is not.  Dkt. 83-2, ¶ 25.  Katholos maintained contact with UBS representatives concerning account activity and investment options.  Dkt. 83-2, ¶ 26; Dkt. 98-1, ¶ 26.

At some point, UBS proposed creation of a Hong Kong entity to facilitate different investments.  Dkt. 83-2, ¶ 28; Dkt. 98-1, ¶ 28; Dkt. 111-1, ¶ 28.  The Government asserts that Katholos signed and sent a letter to the Foundation's board asking that it consider creating a private investment company in Hong Kong and transfer the assets and account held in the Foundation's name to the new, Hong Kong entity.  Dkt. 83-2, ¶ 29.  Katholos does not dispute that the letter contains her signature, but disputes that she requested anything because all decisions were made by her father.  Dkt. 98-1, ¶ 29.  She states that she did not create the letter, but that anything her father or UBS told her to sign, she signed. *Id.*

On December 29, 2005, Hong Kong issued a certificate of incorporation for Storchen Finance Ltd.  Dkt. 83-2, ¶ 34; Dkt. 98-1, ¶ 34.  On January 3, 2006, Storchen Finance Ltd. board members established a UBS account ending in 65569 ("Storchen Finance Account") in the name of Storchen Finance Ltd.  Dkt. 83-2, ¶ 35;

Dkt. 98-1, ¶ 35.  Katholos is listed as one of the beneficial owners of the Storchen Finance Account.  Dkt. 83-2, ¶ 35; Dkt. 98-1, ¶ 35.

Katholos maintained communication with UBS bankers regarding investment strategies, performance of the accounts, and instructions on how to invest better.  Dkt. 83-2, ¶ 39; Dkt. 98-1, ¶ 39 (not disputing that Katholos communicated with UBS on her father's behalf).

On February 27, 2007, Katholos sent a request to UBS to transfer 35,000 euros from the Storchen Finance Account, which she described as "my account Storchen 1," to her personal account in Athens.  Dkt. 83-2, ¶ 45; Dkt. 98-1, ¶ 45.  The transfer was made on February 28, 2007.  Dkt. 83-2, ¶ 45; Dkt. 98-1, ¶ 45.  On June 11, 2007, Katholos emailed UBS requesting a transfer of 50,000 euros to the Bank of Cyprus from the Storchen Finance Account, which was executed that day.  Dkt. 83-2, ¶ 48; Dkt. 98-1, ¶ 48.  On November 27, 2007, Katholos emailed UBS stating that she would like to make a loan to an investor with funds from the Storchen Finance Account, and that transfer was made the same day.  Dkt. 83-2, ¶ 49; Dkt. 98-1, ¶ 49.  Also, in December 2017, a transfer of 10,000 euros was made from the Storchen Finance Account for the benefit of Katholos.  Dkt. 83-2, ¶ 50; Dkt. 98-1, ¶ 50.

For decades, the Katholos family used the same certified public accountant— Charles Koelemeyer—to prepare their federal income tax returns.  Dkt. 83-2, ¶ 59; Dkt. 98-1, ¶ 59.  The Government contends that Mr. Koelemeyer prepared an individual income tax return for Katholos in 2007.  Dkt. 83-2, ¶ 69.  Katholos

contends she is unaware of who prepared the return.  Dkt. 98-1, ¶ 69.  Katholos never spoke to Mr. Koelemeyer about the preparation of her returns from 2005 to 2007, and she never reviewed, signed, or filed those returns.  Dkt. 83-2, ¶ 72; Dkt. 98-1, ¶ 72.  On her individual tax return for 2007, questions relating to interest in or signature authority over foreign accounts and trusts were answered in the negative.  Dkt. 83-2, ¶ 70.  Katholos did not file a Report of Foreign Bank and Financial Accounts ("FBAR") for 2007.  Dkt. 83-2, ¶ 58; Dkt. 98-1, ¶ 58.

On July 17, 2008, because of a criminal investigation by United States authorities, UBS announced that it would no longer provide cross-border services to United States clients or offshore trusts, foundations, and non-operating corporations beneficially owned by United States citizens.  Dkt. 83-2, ¶ 73; Dkt. 98-1, ¶ 73.  Katholos went to Zurich and was told that, "[a]ll U.S. people had to leave the bank."  Dkt. 83-2, ¶ 75; Dkt. 98-1, ¶ 75.  UBS even offered to carry the money out for her.  Dkt. 83-2, ¶ 75; Dkt. 98-1, ¶ 75.  Katholos refused, Dkt. 83-2, ¶ 75; Dkt. 98-1, ¶ 75, and the Storchen Finance Account remained open until at least 2013.  Dkt. 83-2, ¶ 80; Dkt. 98-1, ¶ 80.

In February 2009, Katholos attempted to make a voluntary disclosure to the Internal Revenue Service ("IRS"), but it was rejected as untimely.  Dkt. 83-2, ¶ 81; Dkt. 98-1, ¶ 81.  Katholos timely submitted an FBAR for calendar years 2008 and 2009, but she did not mention the Storchen Finance Account.  Dkt. 83-2, ¶¶ 83, 84; Dkt. 98-1, ¶¶ 83, 84.

The IRS investigated Katholos for potential violations of FBAR reporting requirements.  Dkt. 83-2, ¶ 89; Dkt. 98-1, ¶ 89.  The IRS assessed and imposed a willful FBAR penalty against Katholos for calendar year 2007 in the amount of $4,127,601.75.  Dkt. 83-2, ¶ 93; Dkt. 98-1, ¶ 93.

Around March 31, 2016, the IRS issued a Notice of Deficiency to Katholos with tax penalties for years 2006 through 2008.  Dkt. 98-1, ¶¶ 201, 202; Dkt. 111-1, ¶¶ 201, 202.  Katholos filed a petition in the United States Tax Court contesting the proposed deficiency.  Dkt. 98-1, ¶ 204; Dkt. 111-1, ¶ 204.  A stipulated decision was entered in the case on April 23, 2021.  Dkt. 98-1, ¶ 207; Dkt. 111-1, ¶ 207.

**ANALYSIS**

## I.   Katholos's Motion to Strike Allegations in the Complaint

Katholos moves for an out-of-time order striking several allegations in the Complaint.  *See* Dkt. 81.  Katholos argues that her stipulation with the IRS in the Tax Court case refutes the allegations in the Complaint, thereby precluding admission of evidence supportive of such allegations.  *Id.*  Alternatively, Katholos asks that the Court designate an expert to explain tax law principles underlying "that stipulated decision and [to] demonstrate their conflict with such allegations." *Id.* at 1.

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading . . . any . . . immaterial, impertinent, or scandalous matter."  To succeed on a motion to strike, the moving party must show that no evidence in support of the allegations proposed to be stricken would be admissible, the allegations have no

8

bearing on the relevant issues, and permitting the allegations to stand would result in prejudice. *Holmes v. Fischer*, 764 F. Supp. 2d 523, 532 (W.D.N.Y. 2011); *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001).

Katholos mainly argues that evidence of the challenged allegations would be precluded based on the stipulation and, therefore, inadmissible. In relevant part, the stipulation, entered on April 23, 2021, states that Katholos does not owe any income tax, additions to tax, or penalties for the 2007 tax year. It also states that "none of the exceptions to the [statute of] limitations on assessments set forth in I.R.C. § 6501(c) applies to any of petitioner's tax years 2006, 2007, and 2008." Dkt. 81-1. Katholos contends this means that the IRS acknowledged that her 2007 tax return was not a "false or fraudulent return." Dkt. 81 at 3-4; *see* 26 U.S.C. § 6501(c)(1) (stating that in the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed at any time).

Preclusion based on a prior decision applies if: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997) (internal quotation marks and citation omitted).

The Court finds that none of the issues raised in the challenged allegations was raised in the stipulation.[3]  For example, the allegation that Katholos failed to report certain earnings and interest income in 2007, Dkt. 6, ¶ 32, does not necessarily conflict with the conclusion that there was no tax deficiency for that year.  *See* Dkt. 82 at 10 (explaining that there are "innumerable combinations of income, deductions, losses, and credits, as well as other issues, that may cause a taxpayer not to owe income tax for a particular year").

Katholos also argues that several of the allegations, considered in the aggregate, conflict with the *de facto* agreement in the stipulation that Katholos did not fraudulently file her 2007 tax return.  *See, e.g.*, Dkt. 81 at 9-10 ("[I]t could not have been, as the complaint alleges, Ms. Katholos who had, in fact, 'checked the box "No" for both' of the relevant questions on her 2006 and 2007 returns covering foreign bank accounts and trusts.  Because if she had been the one who had supplied that negative answer, then given the additional allegations in paragraph

---

[3] The closest overlap between the challenged allegations and the stipulation is the allegation that states:

> According to the Form 4549, dated October 30, 2014, the income tax deficiencies for such years based on the failure to report these earnings are as follows:

| Year Ended | | Increase in Tax Due |
|---|---|---|
| December 31, 2007 | $ | 46,340.47 |

Dkt. 6, § 36.  This 2014 form appears to conflict with the later stipulation, which states that there is no deficiency for the 2007 tax year.  Dkt. 81-1.  But the stipulation does not alter that Katholos was initially thought to be deficient on October 30, 2014.

27 of the complaint that the defendant 'controls/controlled the UBS Account No. 65569' and 'was involved with the decision making regarding the performance and investments of the UBS Account No. 65569,' her negative answer would have rendered her 2006 and 2007 returns fraudulent.").  But the stipulation contained no *factual* conclusions regarding the issue of fraud, and the issue in this case will be whether Katholos *willfully* failed to file an FBAR.  In other words, the stipulation may preclude certain legal issues from being relitigated, but it does not preclude the admission of evidence to prove a different issue.  *See Matusick v. Erie County Water Authority*, 757 F.3d 31, 48-49 (2d Cir. 2014) ("Critical to the resolution of the question [of preclusion] is the determination of whether the 'issue' that is identical in the two proceedings involves a factual or legal determination. . . . If the issues are merely [factual], they need only deal with the same past events to be considered identical.  However, if they concern the legal significance of those facts, the legal standards to be applied must also be identical; different legal standards as applied to the same set of facts create different issues." (internal quotation marks and citation omitted)).

Because the challenged allegations are not identical to the issues discussed in the stipulation, collateral estoppel is inapplicable and, therefore, does not preclude the admissibility of evidence supportive of those challenged allegations.  To the extent Katholos raises additional relevancy and Rule 403(b) objections about such evidence, the Court will entertain those objections at or before trial.  Ultimately, however, nothing warrants striking these allegations, which are just that—

11

allegations.  *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("[C]ourts should not tamper with the pleadings unless there is a strong reason for so doing."); *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 399 (S.D.N.Y. 2021) ("[M]otions to strike are viewed with disfavor and infrequently granted." (internal quotation marks and citation omitted)); *Crespo v. New York City Transit Auth.*, No. 01-CV-0671, 2002 WL 398805, at *11 (E.D.N.Y. Jan. 7, 2002) ("[M]otions to strike are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation." (internal quotation marks and citation omitted)).

The Court also denies Katholos's alternative request for the Court to allow Katholos to designate a tax law expert to explain further the "proper construction of that decision document." Dkt. 81 at 14.  At this time, there is no apparent reason why the Court would be unable to provide the jury with any necessary instruction pertaining to the stipulation.

For these reasons, Katholos's motion to strike is denied.

## II.  <u>Motion for Summary Judgment</u>

Also pending before the Court is the Government's motion for summary judgment with respect to: (1) its claim that Katholos violated 31 U.S.C. § 5314 and implementing regulations; and (2) its assessment of penalties pursuant to 31 U.S.C. § 5321(a)(5)(C).

Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Only disputes "over facts that might affect the outcome of the suit under the governing law will . . . preclude the entry of summary judgment."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, courts "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *See Lederman v. New York City Dep't of Parks and Recreation*, 731 F.3d 199, 202 (2d Cir. 2013) (quotation marks and alterations omitted).

Section 5314 requires United States citizens to "keep records, file reports, or keep records and file reports, when the . . . citizen . . . makes a transaction or maintains a relation for any person with a foreign financial agency."  In 2007, implementing regulations required that a person "having a financial interest in, or signature or other authority over . . . [a] financial account in a foreign country shall report such relationship to the Commissioner of the Internal Revenue for each year in which such relationship exists, and shall provide such information as shall be specified in a reporting form prescribed by the Secretary to be filed by such persons."  31 C.F.R. § 103.24 (2007), *amended and recodified at* 31 C.F.R. § 1010.350 (2011).  Covered individuals were required to file the reporting form, known as the FBAR, "on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year."  31 C.F.R. § 103.27(c) (2007).

Penalties for violating Section 5314 differ based on the willfulness of the violation. Non-willful violations result in a penalty that "shall not exceed $10,000." 31 U.S.C. § 5321(a)(5)(B). Willful violations result in a penalty that is the greater of $100,000 or 50 percent of the balance of the account at the time of the violation. *Id.* § 5321(a)(5)(C). The Government contends Katholos willfully failed to file an FBAR in 2007, and maintains that the $4,127,601.75 penalty is correct.

Katholos admits that: (1) she was a U.S. citizen; (2) during 2007, the Storchen Finance Account was a foreign financial account with a balance of over $10,000; and (3) she did not file an FBAR for calendar year 2007. Dkt. 98 at 11. Katholos disputes, however, that she had a "financial interest in, or signature or other authority over," the Storchen Finance Account such that she was obligated to report it on a 2007 FBAR. She further argues that, even if she was obligated to file an FBAR in 2007, her failure to do so was not willful, and that the $4,127,601.75 penalty is incorrect.

## A. Whether Katholos had a financial interest in, or signature or other authority over the Storchen Finance Account

### 1. Financial Interest

The parties seem to agree that the FBAR instructions, and the definitions they contain, are not binding on this Court.[4] The Court employs a plain-meaning

---

[4] Katholos argues that the Government "cannot disregard the only all-inclusive definition of 'financial interest' that existed at that time and was set forth in the FBAR instructions," Dkt. 98 at 17, but later acknowledges that the "instructions in a form, without notice and comment, do not have the force of law, and absent formal rulemaking, the plain meaning of terms like 'signature or other authority' apply,"

approach to determine the meaning of "financial interest" and "signature or other authority." *See United States v. de Forrest*, 463 F. Supp. 3d 1150, 1157 (D. Nev. 2020) (appearing to use a plain-meaning approach); *United States v. Kelley-Hunter*, 281 F. Supp. 3d 121 (D.D.C. 2017) (same); *United States v. Zimmermann*, No. 2:19-CV-4912-CAS-EX, 2020 WL 6065333, at *4 (C.D. Cal. Sept. 16, 2020) (same); *see also In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 480-81 (S.D.N.Y. 2017) (noting that the term "financial interest" was not defined by Section 103.24).

Black's Law Dictionary defines "financial interest" as an "interest involving money or its equivalent." Interest, Black's Law Dictionary (11th ed. 2019). In turn, "interest" is defined as a "legal share in something; all or part of a legal or equitable claim to or right in property." *Id.*

Here, it is undisputed that Katholos was a beneficial owner of the Storchen Finance Account. In general, a "beneficial owner" is "[o]ne recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else; esp., one for whom property is held in trust.—Also terms *equitable owner*."[5] Owner, Black's Law Dictionary (11th ed. 2019). Though Katholos denies that her status as a beneficial owner is "tantamount to having a 'financial interest' in the account that may give rise to the FBAR reporting requirements," Dkt. 98-1, ¶ 25, the Court concludes that, as a beneficial

---

*id.* at 25. Katholos has cited no authority to support her inconsistent stance toward the definitions contained in the FBAR instructions.

[5] Relatedly, Black's Law Dictionary defines "beneficial interest" as a "right or expectancy in something (such as a trust or an estate), as opposed to legal title to that thing." Interest, Black's Law Dictionary (11th ed. 2019).

owner, Katholos had an equitable claim or right to the Storchen Finance Account—even if she did not have legal title. And because "interest" includes equitable rights to property, Katholos's arguments regarding legal title, who funded the account, and direct interest are not dispositive. *See Continental Cas. Co. v. Bowen*, No. 2:09-cv-00810-TC, 2011 WL 222340, *4 (D. Utah Jan. 21, 2011) ("Although an ownership interest in an entity would certainly be considered a financial interest in that entity, ownership is not necessary to have a financial interest."). Thus, based on her status as a beneficial owner, the Court concludes that Katholos had a financial interest in the Storchen Finance Account.

### 2. Signature Authority

The Court also concludes that Katholos was required to file a 2007 FBAR based on her signature authority over the Storchen Finance Account. *See* Signatory authority, Black's Law Dictionary (11th ed. 2019) ("1. The power to bind with a signature, esp. as a result of an express grant of the power.—Also termed *signing authority*. 2. License to make a decision, esp. to withdraw money from an account or to transfer a negotiable instrument.").

Katholos notes that her signature was not on the applicable signature card for the Storchen Finance Account and argues that the authority to dispose of and manage the funds of the Storchen Finance Account rested solely with the board. Dkt. 98 at 20-22. She also states that, to the best of her knowledge, she could not act on her own with respect to the Storchen Finance Account. Dkt. 98-1, ¶ 153. In support, Katholos cites *United States v. Horowitz*, 361 F. Supp. 3d 511 (D. Md.

16

2019), *aff'd*, 978 F.3d 80 (4th Cir. 2020), in which the defendant had not signed the signature card for an account and, therefore, could not control the disposition of money, funds, or other assets in the account.  Dkt. 98 at 21-22.

In *Horowitz*, however, the court determined that "[w]ithout that signature specimen, [the defendant] could not write to, or otherwise directly communicate with, the bank to control the disposition of money, funds or other assets" in the account.  *Horowitz*, 361 F. Supp. 3d at 524 (internal quotation marks and citation omitted).  In contrast, in this case, the Government has sufficiently shown that Katholos controlled the disposition of funds even though her signature was not on the signature card for the Storchen Finance Account.

For example, it is undisputed that on February 27, 2007, Katholos handwrote a letter to UBS requesting a transfer of 35,000 euros from the Storchen Finance Account—which she referred to as "my account Storchen 1"—to her account in Athens, and that the transfer was executed the next day.  Dkt. 83-2, ¶ 45; Dkt. 98-1, ¶ 45.  Likewise, it is undisputed that on June 11, 2017, Katholos sent an email requesting a transfer of 50,000 euros from the Storchen Finance Account to the Bank of Cyprus, and the transfer was made that day.  Dkt. 83-2, ¶ 48; Dkt. 98-1, ¶ 48.  Furthermore, on November 27, 2007, Katholos sent an email asking that a loan be taken out of the Storchen Finance Account, and the transfer was made that day.  Dkt. 83-2, ¶ 49; Dkt. 98-1, ¶ 49.

While Katholos generally contends that any of her requests were made on behalf of her father, and that she served solely as a means of communication

17

because of her father's limited English, *see, e.g.*, Dkt. 98 at 24, the Government notes, "[t]here is no evidence that [her father's] signature or verbal approval was ever required by UBS or the Storchen Foundation board[6] for [Katholos] to manage the funds in the accounts," Dkt. 83-1 at 8.  Furthermore, Katholos admits that in 2008, after she learned that there was a potential problem, she traveled to Zurich where UBS encouraged her to close the account and advised that they could arrange for her to carry the funds in cash out of the bank.  *See* Dkt. 98-1, ¶¶ 192-195.  Based on this evidence, the Court concludes that Katholos also had signature authority over the Storchen Finance Account.

Therefore, the Court grants the Government's motion for summary judgment in part as to Katholos's financial interest and signature authority over the Storchen Finance Account and, thus, her obligation to file an FBAR disclosing such interest in and authority over the account in 2007.

### B. Whether Katholos's failure to file an FBAR in 2007 was willful

Having determined there is no triable issue as to whether Katholos had a financial interest in or signatory authority over the Storchen Finance Account, the Court concludes that Katholos was obligated to file an FBAR in 2007.  Thus, the Court must next consider whether Katholos's failure to file was *willful*.

The parties agree that willfulness includes recklessness.  Dkt. 83-1 at 9; Dkt. 98 at 25.  In defining recklessness, courts in the Second Circuit employ an objective

---

[6] Katholos admits that the Foundation owned Storchen Finance Ltd.  *See* Dkt. 98 at 13.

standard and ask whether the individual "'fail[ed] to act in the face of an
unjustifiably high risk of harm that is either known or so obvious that it should be
known.'" *United States v. Gentges*, 531 F. Supp. 3d 731, 744 (S.D.N.Y. 2021)
(quoting *United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020)); *see also
Horowitz*, 978 F.3d at 89 (noting that willfulness is established if "the defendant (1)
clearly ought to have known that (2) there was a grave risk that an accurate FBAR
was not being filed and if (3) he was in a position to find out for certain very easily"
(internal quotation marks and citation omitted)).

The Government argues that the evidence establishes, as a matter of law,
"key indicia of willfulness, including a pattern of concealment and a reckless
indifference toward [Katholos's] obligations with respect to reporting foreign
accounts to the IRS." Dkt. 83-1 at 10.  Katholos argues that the facts are subject to
interpretation and that the Government has improperly drawn inferences in its
favor. Dkt. 98 at 29. The Court agrees with Katholos—willfulness is a matter for
the factfinder.

For example, the Government argues that Katholos demonstrated reckless
indifference toward her obligations by failing to communicate with her family's
long-term accountant—Mr. Koelemeyer—about her foreign accounts, or to review
the returns prepared for her at the time. Dkt. 83-1 at 10.  But Katholos argues that
these facts do not establish, as a matter of law, that she was easily able to
determine her obligations because Mr. Koelemeyer's statements regarding his

knowledge about FBAR reporting requirements are open to interpretation and require assessment of his credibility. Dkt. 98 at 27-28.

Further, the Government argues that concealment is probative of willfulness, Dkt. 83-1 at 10 (citing *United States v. DeMauro*, 483 F. Supp. 3d 68, 83 (D.N.H. 2020)), and that the facts indicate a long pattern of concealment. For example, the Government notes that the first two UBS accounts were "numbered" accounts, mail was held for at least one of those accounts, and Katholos misrepresented on opening documents that she was not a United States citizen, *id.* at 10-11 (citing caselaw to argue that these facts show that she was "eliminat[ing] the paper trail associated with the undeclared assets and income" she held in foreign accounts).

As to the Foundation Account, the Government notes that Katholos failed to inform her siblings, living in the United States, about the Foundation Account even though their passports were used in its opening, and that the Foundation itself was formed in Liechtenstein, a known tax-haven country. *See* Dkt. 83-1 at 12-14. Furthermore, the Government argues that Katholos directed the Foundation's board to create Storchen Finance Ltd., which served as a shell corporation to further conceal her beneficial ownership of the Storchen Finance Account. Dkt. 83-1 at 12-13 (citing caselaw referring to the creation of shell corporations to conceal interests and evade United States tax regulations).

Katholos argues, however, that "the use of entities, numbered accounts, and 'hold mail' cannot be viewed in [a] vacuum when considering willfulness." Dkt. 98 at 32. Katholos asserts that she was just a means of communication because of her

father's language barrier and that all of these facts were decisions made by her father whose intent cannot be imputed to her. *Id.* at 29-30. She also notes that she provided UBS with her United States passport.

Finally, the Government notes that Katholos attempted to enter the IRS's Offshore Voluntary Disclosure Program in February 2009, but continued to conceal her beneficial ownership of the Storchen Finance Account on the FBARs she submitted for 2008 and 2009. Dkt. 83-1 at 14. Katholos responds that her attempt to participate in voluntary disclosure, along with her attempt to discover her tax obligations in Greece, indicates her good faith intent to be tax compliant. Dkt. 98 at 30, 32-33; *see also* Dkt. 98-1, ¶ 198 (noting that, "as soon as [she] saw something wasn't done right, [and] that there were problems," Katholos attempted to obtain a lawyer and participate in voluntary disclosure "right off the bat").

Summary judgment here is inappropriate. *See Anderson*, 477 U.S. at 250-51 (concluding that summary judgment should not be granted "[i]f reasonable minds could differ as to the import of the evidence"). "A jury could . . . conclude that [Katholos's conduct] reveal[s] willful blindness, or establish[es] a pattern of conduct so unreasonable as to constitute reckless disregard. Still, . . . a reasonable jury [could] conclude otherwise. And that is enough to make summary judgment on the issue of willfulness inappropriate." *Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 264 (2d Cir. 2005).

For this reason, the Government's motion for summary judgment is denied with respect to Katholos's willful failure to file a 2007 FBAR. The Court reserves

determination of the correctness of the penalty pending trial on the issue of willfulness.

### III.   Motion to Amend the Answer

Katholos seeks to amend two responses contained in her amended answer to the Complaint. Dkt. 96-1. Specifically, Katholos admitted paragraph 41 of the Complaint, which states that she "had a financial interest in and signature authority over UBS Account No. 65569 during the years 2006 through—at least—2008." Dkt. 32, ¶ 41 ("The allegations are admitted"). Katholos also seeks to change language found in her affirmative defense, which currently reads: "In dealings with the Swiss bank, Marika's father Theodore Katholos was the primary decision-maker. Marika had signatory authority because of Mr. Katholos' limited reading and writing skills and because she was the one member of the family located in Europe." *Id.*, ¶ 55. She wishes to replace "had signatory authority" with language that she "communicated with the bank on behalf of Mr. Katholos." Dkt. 96-1 at 5.

For the reasons stated above, this Court has concluded—without consideration of Katholos's responses to the Complaint—that Katholos had a financial interest in and signature authority over the Storchen Finance Account. Therefore, the Court denies as moot Katholos's motion to amend her answer.

### CONCLUSION

For the reasons stated above, the Court DENIES Katholos's motion to strike, Dkt. 81, GRANTS IN PART and DENIES IN PART the Government's motion for

summary judgment, Dkt. 83, and DENIES AS MOOT Katholos's motion to amend,

Dkt. 96.[7]


**SO ORDERED.**


Dated:      August 10, 2022
              Buffalo, New York

                                    JOHN L. SINATRA, JR.
                                    UNITED STATES DISTRICT JUDGE

---

[7] The Court has reached its conclusions without deciding several issues regarding previously unproduced evidence.  These issues can be resolved at the final pretrial conference.

23